```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #21cv2302
 DOMINGUEZ,                          :

                   Plaintiff,       :

   - against -                      :

 CITY OF NEW YORK, et al.,          : New York, New York
                                      March 14, 2023
                   Defendants.      :

------------------------------------ :

                      PROCEEDINGS BEFORE
            THE HONORABLE KATHERINE POLK FAILLA,
             UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For Plaintiff:          BROMBERG LAW OFFICE, P.C.
                        BY:  BRIAN BROMBERG, ESQ.
                        352 Rutland Road #1
                        Brooklyn, New York 11225

                        BRUSTEIN LAW PLLC
                        BY:  EVAN BRUSTEIN, ESQ.
                        299 Broadway, Suite 800
                        New York, New York 10007

For Defendants:         NEW YORK CITY LAW DEPARTMENT
                        BY:  JOHN SCHEMITSCH, ESQ.
                        100 Church Street
                        New York, New York 10007




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                        PROCEEDING                  3
 2              THE CLERK:  Your Honor, this is in the matter
 3    of Dominquez v. City of New York.  Counsel, please state
 4    your name for the record, beginning with the plaintiff.
 5              MR. BRIAN BROMBERG:  Brian Bromberg, Brian
 6    Bromberg P.C. for the plaintiff.  Good afternoon, Your
 7    Honor.
 8              THE COURT:  Sir, good afternoon, and thank you
 9    very much.  Mr. Brustein.
10              MR. EVAN BRUSTEIN:  Good morning, Your Honor,
11    Evan Brustein, Brustein Law, also for plaintiff.
12              THE COURT:  Thank you so much.  Between the two
13    of you, to whom should I be directing my questions in
14    the first instance?
15              MR. BRUSTEIN:  To me, Your Honor, Evan
16    Brustein.
17              THE COURT:  All right, thank you so much.  And
18    representing the defendants in this case.
19              MR. JOHN SCHEMITSCH:  Good afternoon, Your
20    Honor, John Schemitsch.
21              THE COURT:  Sir, good afternoon as well, and
22    thank you.  Counsel, please understand that because this
23    is in a videoconferencing platform, occasionally you
24    move and perhaps I do as well.  So I am trying to look
25    at the person with whom I am speaking even if that
```

```
 1                      PROCEEDING                    4
 2  person's orientation on my platform changes.  So don't
 3  think I'm ignoring you.  I am not.
 4           Mr. Bromberg, since, excuse me, Mr. Brustein,
 5  since the last of the premotion submissions that I've
 6  received which was February 21, are there any
 7  developments of which I should be made aware?
 8           MR. BRUSTEIN:  Yes, Your Honor, the only
 9  additional development is that in addition to getting a
10  date or dates for the deposition of Inspector
11  Mastronardi, we also require dates for Officer Waite.
12           THE COURT:  And was there – what was the
13  problem with scheduling that before now?
14           MR. BRUSTEIN:  There were no dates provided
15  that worked for the parties, and we've requested
16  additional dates and have not been given them.
17           THE COURT:  I see, and tell me, again, please
18  for which defendant.
19           MR. BRUSTEIN:  Officer Waite.
20           THE COURT:  Thank you.
21           MR. BRUSTEIN:  W-A-I-T-E, just for the record.
22           THE COURT:  I do have it, thank you, sir.  All
23  right, and I thought I understood, Mr. Brustein, that
24  there was some discussion among defendants about whether
25  Inspector Mastronardi was actually present.  Is it your
```

```
 1                        PROCEEDING              5
 2   understanding - have the parties worked out that he was,
 3   in fact, present?
 4            MR. SCHEMITSCH:  I'm sorry, Your Honor, was
 5   that directed to --
 6            THE COURT:  It was, yes.  I'll ask the question
 7   again.  I thought the parties were going to be
 8   discussing whether Inspector Mastronardi was, in fact,
 9   present.  Is it understanding that he was present at the
10   events and that's why his deposition is needed.
11            MR. BRUSTEIN:  Yes, Your Honor, when the first,
12   the case first began, defendants identified Inspector
13   Mastronardi as one of approximately 24 NYPD officers who
14   were in the vicinity of the incident at or about the
15   time of the incident.  In addition to that, they
16   identified him in their initial disclosure as witnesses
17   that they believe have relevant information for this
18   case.  Based upon that as well as his stature as an
19   inspector, we believe that his testimony is relevant to
20   find out not only what happened but why so many officers
21   on the scene were not complying with the body worn
22   camera requirements of the NYPD.
23            THE COURT:  All right, one moment please, sir,
24   thank you.  Why I was asking the question, Mr. Brustein,
25   is because in the defendants' letter of February 21 I'm
```

```
 1                        PROCEEDING                  6
 2   told that they have reason to believe he might not
 3   actually be present.  So perhaps I'll direct those
 4   questions to Mr. Schemitsch.  Thank you.  But, Mr.
 5   Brustein, before I do that, is it your understanding
 6   that all 24 officers were percipient witnesses to the
 7   events underlying your client's action?
 8             MR. BRUSTEIN:  No, Your Honor, we do not know
 9   because from the beginning of the case we had asked for
10   clarification from prior defense counsel as to details
11   about the 24 witnesses and who actually had witnessed or
12   been inside the venue where our client was assaulted,
13   and we did not get any clarification.  The first time
14   that we got any clarification beyond the individual
15   defendants is right before the first time discovery
16   almost closed when those five short video clips were
17   turned over by the defendants.  Prior to that there was
18   no information, so, unfortunately, we've been limited in
19   trying to determine which other officers were involved.
20             THE COURT:  Even today as you're sitting here
21   talking to me, are you telling me that you still have
22   not worked out with defense counsel which officers were
23   actually involved or present?
24             MR. BRUSTEIN:  Correct, Your Honor.  They
25   provided an incomplete list of who the witnesses were
```

```
 1                         PROCEEDING                 7
 2   based on the videos, and so we cannot say with any
 3   degree of certainty which of the 24 officers were not
 4   present.  And with respect to Mastronardi, his
 5   supervisory status as being in charge of the command,
 6   based on the level of the incident, the type of police
 7   response, we've a good faith basis for believing that he
 8   would've been on scene as they're claiming that he was,
 9   you know, in the vicinity, and if not he had obligations
10   under the patrol guide with respect to the retention of
11   the body-worn cameras and ensuring that not only they
12   were retained but that his officers were recording
13   during the incident.
14            THE COURT:  Is it your belief, sir, that all 24
15   officers should have been recording?
16            MR. BRUSTEIN:  According to the declaration –
17   Evan Brustein, I don't know how many times I --
18            THE COURT:  No, no, that's fine, thank you,
19   sir.  Okay, yes.
20            MR. BRUSTEIN:  So in terms of the declaration
21   that was provided, the second declaration I should
22   clarify, by Allison Aronson, the only officer on scene
23   who did not have a body-worn camera was, who was not
24   assigned a body-worn camera I should say, was Inspector
25   Mastronardi.  So it's our understanding the other 23
```

1                          PROCEEDING                    8

2    should have.

3          You know, I'm not going to get into whether or

4    not inspectors, when they respond to scenes, should or

5    should not be assigned body-worn camera at this hearing.

6    I don't think that's necessarily relevant.  But

7    according to the declaration 23 had been assigned them

8    at the beginning of their tours.

9          THE COURT:  Okay.  Mr. Schemitsch, let me speak

10   with you, sir.  As hard as I try, I'm not sure that I've

11   gotten full clarity on these issues.  Do you know as

12   you're talking to me who was present when the events

13   described in plaintiff's complaint took place?

14         MR. SCHEMITSCH:  Well, Your Honor, to be clear,

15   with the events plaintiff's alleging, there were quite a

16   few officers who were on scene.  Not everybody was

17   present for the allegations of this specific alleged

18   incident.  There were a number of officers who were

19   there who did not go into the building, who were just in

20   the vicinity as they were responding to the call.  We

21   have identified those 24 individuals that we believe are

22   present.  We are still investigating and are still

23   unclear if Mastronardi was himself present.

24         THE COURT:  But, sir, several weeks ago you

25   told me that's what you were going to figure out in time

```
 1                    PROCEEDING                    9
 2  for this conference, and here we are.  So I would hope
 3  that you would've figured out in time for this
 4  conference.
 5          MR. SCHEMITSCH:  Yes, and I apologize for that,
 6  Your Honor.  He is a higher-up at the NYPD, and I have,
 7  I believe he's since been promoted to a Chief, and I've
 8  been working with my client to get in touch with him and
 9  get dates, and I understand the frustration involved
10  with this.
11          THE COURT:  I'm not sure you do.  You're
12  telling me that you haven't even spoken to him.  It's
13  not a question about his deposition.  You haven't talked
14  to him enough to know whether he has percipient
15  information or not.
16          MR. SCHEMITSCH:  No, I have not, Your Honor.
17          THE COURT:  I don't understand how that can be.
18  If you were - first of all, I think it is unwise for you
19  to come to this conference unprepared.  Second of all, I
20  think it is unwise to promise me something in your
21  letter and not actually deliver.  If there's a problem
22  with your own client, I think you hv to let me know so
23  that I can order what I need to order so that we're not
24  in the position we are right now which is that several
25  extensions later you still haven't figured out who's
```

```
 1                        PROCEEDING              10
 2   involved.
 3           Let me go back to my original question, Mr.
 4   Schemitsch.  The 24 officers who were identified, did
 5   they all go in the building or were they simply on
 6   scene?
 7           MR. SCHEMITSCH:  Some of them went into the
 8   building; not all of them went into the building, Your
 9   Honor.
10           THE COURT:  Did you - well, of the - do I have
11   the number right there, 24 on the list attached to the
12   second declaration or the supplemental declaration, is
13   that correct?
14           MR. SCHEMITSCH:  Just one moment, Your Honor.
15           (pause in proceeding)
16           THE COURT:  Yes, there are - okay, there are
17   24.  And --
18           MR. SCHEMITSCH:  Yes, Your Honor.
19           THE COURT:  -- you don't know what to say about
20   Inspector Mastronardi because you haven't yet had a
21   chance to talk to him.  Of the remaining 23 how many
22   have you or one of your colleagues in the Law Department
23   spoken with?
24           MR. SCHEMITSCH:  I cannot say for my
25   predecessor for how many she has directly spoken with on
```

1 | PROCEEDING                    11

2  this case, but I have spoken to I believe roughly half,

3  Your Honor.

4           THE COURT:  Why is that you can't tell me with

5  whom your predecessor spoke?  I would've thought that,

6  given the age of this case, that there would've been an

7  effort by both - I assume when you say you've spoken

8  with half, it's because she spoke with the other half.

9  So certainly in turning over the file to you, she

10 must've told you with whom she spoke, no?

11          MR. SCHEMITSCH:  She was able to tell me some

12 individuals that she recalled speaking with but does not

13 specifically recall if she had spoken with all these

14 other individuals or was informed by certain people that

15 others were on scene or had gotten some of the

16 information from paperwork.

17          THE COURT:  Sir, tell me please when you took

18 over the case.

19          MR. SCHEMITSCH:  I believe I took it over just

20 over a year ago, Your Honor.

21          THE COURT:  Okay, and in the year you've had

22 this case, you have not made an effort to speak with all

23 23 of those officers, well, 24 but we've already talked

24 about Mr. Mastronardi.  You haven't had occasion to

25 speak with them in a year?

```
 1                        PROCEEDING              12

 2          MR. SCHEMITSCH:  I've not, Your Honor.

 3          THE COURT:  Did - it would seem to me, not that

 4   I'm going to tell folks how to do their job because it

 5   isn't what I do anymore, but it would seem to me that

 6   you'd want to know if the 23 people could say

 7   definitively they weren't there, they remained outside,

 8   they have no first-hand information that would be of use

 9   because then we wouldn't have conferences like this

10   where you're forced to tell me what you've done.  So I

11   guess it's only fair I would think for Mr. Brustein and

12   Mr. Bromberg to know to whom they should be directing

13   their requests for depositions.  How can it be that

14   right now today, several years after the filing of this

15   lawsuit, you still don't know who was involved?

16          MR. SCHEMITSCH:  Your Honor, it's clear that

17   some individuals were not present inside the building

18   from my discussions with some of the individuals who

19   were present inside of the building.  As well, I have

20   reached out to quite a few of them to try to ascertain

21   based specifically on the videos who was present based

22   on clips of the videos, photos from them, and,

23   unfortunately, the videos are in large part very dark

24   and unable to be seen.  There's I believe only two

25   videos that actually show the inside of the location,
```

```
 1                    PROCEEDING                13
 2  and in many events individuals just do not recall
 3  simply.
 4            THE COURT:  Of the individuals with whom you've
 5  spoken, and I'm not asking you to disclose privileged
 6  information, please identify each of the people on this
 7  chart who were present during, not necessarily
 8  participants but at least observers of the events that
 9  are described in the plaintiff's complaint.  And then
10  your next question's going to be who was absolutely not
11  present.
12            MR. SCHEMITSCH:  Yes, Your Honor.  Joseph
13  Battista, Dylan Lynch, Patrick Lynch, Patrick Graney,
14  Evan Nielsen were all present and inside of the
15  location.  Sergeant Mannix was present.  I have not been
16  able to ascertain if she went inside of the location.
17  Officer Waite, Officer Iorio were present.  I'm unclear
18  if they went inside of the location.  Officer Lagatolla
19  and Sergeant Tresham were present.  I'm unclear if they
20  went inside of the location.
21            THE COURT:  I'm sorry, those last two please,
22  sir, could you repeat that?
23            MR. SCHEMITSCH:  Officer Lagatolla --
24            THE COURT:  Yes.
25            MR. SCHEMITSCH:  -- and Sergeant Tresham.
```

```
 1                        PROCEEDING              14
 2              THE COURT:  Yes, I see, thank you.
 3              MR. SCHEMITSCH:  Officer Theobold was present.
 4   I believe he did go inside of the location even just
 5   briefly.
 6              (pause in proceeding)
 7              THE COURT:  Did you mention Officer Casciano,
 8   sir?
 9              MR. SCHEMITSCH:  I did not, Your Honor.
10              THE COURT:  Okay, I'll let you continue.
11              MR. SCHEMITSCH:  And that's whom I'm aware of,
12   Your Honor.
13              THE COURT:  Okay.  When you say as to several
14   of them, Mannix, Iorio, Lagatolla, Tresham, you say they
15   were present but you're not sure they went inside.  Do I
16   understand that correctly?
17              MR. SCHEMITSCH:  Yes, Your Honor.
18              THE COURT:  Okay, are there, is there anyone on
19   this chart that I'm now turning to look at who you are
20   certain was not present during the relevant events?
21              MR. SCHEMITSCH:  No, Your Honor, there's no one
22   that I'm 100 percent certain was not present at the
23   location.
24              THE COURT:  I see.  And so in theory the
25   plaintiff is going to have to, the plaintiff is within
```

1                           PROCEEDING              15

2    his rights to depose all 24, correct?

3            MR. SCHEMITSCH:  Should the Court so grant over

4    the limit, yes, Your Honor.

5            THE COURT:  Well, if you're not helping me by

6    narrowing it, I may have to.  Sir, what when - let me

7    please understand the situation with respect to the

8    body-worn camera footage.  I think I need clarity, that

9    I fear I have, but I just want to make sure I have it,

10   please.  The designation no BWC videos means they

11   recorded nothing or it was - because I'm making a

12   distinction between that which was deleted and that

13   which never existed.

14           MR. SCHEMITSCH:  Yes, Your Honor.  So just to

15   clarify, this list is body-worn camera videos taken from

16   2 a.m. to 7 a.m. --

17           THE COURT:  Understood.

18           MR. SCHEMITSCH:  -- on that morning.

19           THE COURT:  Yes.

20           MR. SCHEMITSCH:  The incident itself, I think

21   it's very fair to narrow it down from roughly between

22   when the 911 call was made at about 3:30 in the morning,

23   3:36 or so to about 4:46 when plaintiff was removed by

24   ambulance from the scene.  So, yes, no BWC videos would

25   mean no body-worn camera videos were reported within

1                          PROCEEDING                    16

2  that timeframe.  And just to also clarify, if an officer

3  was not necessarily interacting with the arrest or

4  participating in the arrest, they would not necessarily

5  have been under an obligation to record.

6          THE COURT:  Understood.  All right.  Now, let's

7  then talk please about the deleted videos.  I thought I

8  understood from your submission, sir, that normally such

9  videos might not have been deleted if they were

10 identified as arrest videos but that these were not.  Do

11 I understand that point that you are making correctly?

12         MR. SCHEMITSCH:  That's correct, Your Honor,

13 the retention policy at this point was 18 months for

14 videos that were not characterized as an arrest, a

15 summons, and I believe there's a third category.  So if

16 they were not categorized as that, they would be

17 automatically deleted after 18 months unless otherwise

18 retained.

19         THE COURT:  If they did qualify as one of those

20 categories such as arrest, let's use that one, what is

21 the, is there a protocol for deletion of such videos?

22         MR. SCHEMITSCH:  If they were categorized as an

23 arrest, Your Honor --

24         THE COURT:  Yes.

25         MR. SCHEMITSCH:  -- I believe it was five years

1                          PROCEEDING                17

2   at that point.

3          THE COURT:  Five years, okay.  How is it that –

4   do I understand correctly that the videos for Detective

5   Graney, Detective Nielsen, Sergeant Mannix, Detective,

6   excuse me, Sergeant Tresham, Officer Theobold, Officer

7   Gooden, Officer Eldiasti, when they say deleted, these

8   were deleted because they were ident, they were not

9   identified as arrest videos and they were deleted 18

10  months later, is that your understanding, sir?

11         MR. SCHEMITSCH:  I wouldn't be able to say for

12  something like Sergeant Mannix for that specific video,

13  but I think that is a fair understanding of the reason

14  why it would have been deleted.

15         THE COURT:  Well, when you're demurring as to

16  Sergeant Mannix, why is that?  Is it because she may not

17  have been present for the arrest?

18         MR. SCHEMITSCH:  Specifically with Sergeant

19  Mannix, that would've been recorded prior to even

20  arriving on scene as there was no 911 call even placed

21  by that point.  So that video was recorded at 2:58 in

22  the morning.  The earliest 911 call was after 3:30 in

23  the morning.

24         THE COURT:  You've seen Mr. Bromberg and Mr.

25  Brustein's concern about the deletion of these videos.

```
 1                      PROCEEDING              18
 2   I would like to understand is it your position that they
 3   should have been categorized as arrest videos or that,
 4   based on their timing, they were properly categorized as
 5   non-arrest and that that explains their deletion?
 6           MR. SCHEMITSCH:  It's my understanding that
 7   they, if it was involved in an arrest, they should have
 8   been – to the extent someone was interacting with the
 9   plaintiff as part of the arrest, it should have been
10   categorized as an arrest, yes.
11           THE COURT:  Perhaps my question wasn't clear,
12   so I'll try and give a clearer one.  Let me just look,
13   I'm looking at Officer Theobold.  There's a reference to
14   deleted body-worn camera videos at 2:24 and 2:43.  I
15   presume your position is that antedates the actual
16   arrest in this case and, indeed, the 911 call, and,
17   therefore, it's – there's no problem with, you believe
18   there's no problem with the deletion because it had
19   nothing to do with the arrest, correct?
20           MR. SCHEMITSCH:  Yes, Your Honor, it could've
21   been for an entirely different call.
22           THE COURT:  All right.  And for Officer
23   Eldiasti, the same with respect to a body-worn camera
24   video recorded at 2:19, correct?
25           MR. SCHEMITSCH:  Yes.  Correct, Your Honor.
```

```
 1                        PROCEEDING              19
 2              THE COURT:  Or Officer Gooden, for the 2, well,
 3     we talked about the 4:17.  The 2:14 is too early.  You
 4     government that the second one is, well, it's somebody
 5     else, correct?
 6              MR. SCHEMITSCH:  Yes, Your Honor.
 7              THE COURT:  Okay.  Sergeant Mannix you believe
 8     is too early.  What about Detective Graney?
 9              MR. SCHEMITSCH:  Yes, Your Honor, it's my
10     understanding that that one was deleted and was in the
11     timeframe and would have been of his interaction with
12     plaintiff.
13              THE COURT:  Yes, and the same with Detective
14     Nielsen, correct?
15              MR. SCHEMITSCH:  Yes, Your Honor.
16              THE COURT:  How is it that Detective Graney and
17     Detective Nielsen's body-worn camera footage was
18     deleted?
19              MR. SCHEMITSCH:  It's my understanding that
20     they were, these were ESU officers who were responding
21     to a call for an emotionally disturbed person, that they
22     were unaware that it was an arrest during their
23     interaction, and that it may have been mis-tagged by
24     them as an interaction with an emotionally disturbed
25     person or not as an arrest, and it was deleted at the
```

```
 1                        PROCEEDING              20
 2  18-month mark.
 3            THE COURT:  I see.  With respect to Officer
 4  Dougherty (phonetic), your view is that the deleted
 5  video is out of time, correct?
 6            MR. SCHEMITSCH:  Yes, Your Honor.
 7            THE COURT:  What about Officer Waite please?
 8            MR. SCHEMITSCH:  With respect to the video, I
 9  don't have an understanding for whether or not he was
10  responding to another call at that moment.  But that
11  video was deleted at the 18-month mark is my
12  understanding.
13            THE COURT:  Yes, I think you understand, sir,
14  if not, I'm trying to make clear to you that I am
15  interested as to how these things came to be deleted.
16  With respect to the Graney and Nielsen, I understand the
17  argument, I'm not sure plaintiff's counsel will agree,
18  that as ESU personnel they may not have been attuned to
19  whether the person they were attending to was an
20  arrestee or simply an emotionally disturbed person or
21  something else.  But at least you've been able to tell
22  me how those got deleted.
23            For Officer Waite I want to know why those were
24  deleted.  What do you know?
25            MR. SCHEMITSCH:  Your Honor, I've spoken to
```

PROCEEDING                        21

2  Officer Waite.  He does not recall generally this

3  incident.

4          THE COURT:  All right.  Mr. Schemitsch, what

5  else would you like me to know with respect to the body-

6  worn camera footage?

7          MR. SCHEMITSCH:  I think as we cited in our

8  response, effectively, of the 16 that plaintiff is

9  alleging were deleted, in actuality there really are

10  only three that could apply within that timeframe.  And

11  we're aware that, and of those three it's my

12  understanding that Officer Nielsen, Detective Nielsen

13  and Detective Graney their videos may have just been

14  mis-tagged by that point.  They were not aware that it

15  was necessarily an arrest.  I believe in their

16  depositions they've testified as much to that, that they

17  were not aware that it was the arrest.

18          And we understand the Court's frustration and

19  plaintiff's frustration with these videos no longer

20  existing.  But, Your Honor, to the point, defendants

21  have categorically denied that this incident ever

22  occurred in the way that plaintiff's citing.  We

23  certainly wish these videos did exist, and we wish that

24  we would be able to produce them as we do believe they

25  would have corroborated defendants' story, and it's just

```
 1                        PROCEEDING              22
 2   a focus less on the merits and more on the unfortunate
 3   deletion of these videos automatically.
 4            THE COURT:  All right.  Mr. Brustein, I know
 5   that this conference was occasioned in part by your
 6   request for an opportunity to submit plenary briefing on
 7   this issue.  I'm not sure what that briefing would argue
 8   that you haven't argued in your pre-motion letter.  So I
 9   guess I'd like to first understand whether it is still
10   your wish to have a more robust motion in this regard.
11            MR. BRUSTEIN:  Evan Brustein, Your Honor.
12   Thank you.  I think what I would say is based upon the
13   defendants' own admissions, I don't know that additional
14   briefing is necessary.  From their perspective alone it
15   appears that they admit that three videos would've
16   captured the incident and were deleted when they had an
17   obligation to record.  If the Court wanted it to be
18   further briefed, we certainly could, but I feel
19   confident, based on the record already before the Court,
20   that there is a sufficient record to support the Court
21   making the negative inference or allowing for the
22   negative inferences to be drawn.
23            There are a few things that I'd like to respond
24   to first though in terms of the questioning by Your
25   Honor of defense counsel.
```

```
 1                        PROCEEDING                    23

 2              THE COURT:  Before you do that, sir, I want to

 3   make sure you and I are on the same page.  The three

 4   videos that are now - basically your motion you have

 5   streamlined it to pertain to three videos, correct?

 6              MR. BRUSTEIN:  Your Honor, I'm not streamlining

 7   it to pertain to three videos.  I believe that it's more

 8   than three videos based on the evidence that's

 9   presented.  I'm simply suggesting that the defendants

10   are conceding that it's three videos.  And so our

11   position is at a minimum it's three videos.

12              THE COURT:  Fair enough, sir.  Are those videos

13   the body-worn camera of Graney, Nielsen, and Waite or

14   three others?

15              MR. BRUSTEIN:  Those are the three that I

16   believe that they are conceding.  There are others that

17   we believe certainly would be relevant, and I want to

18   address that if I can to respond to some of the

19   arguments by opposing counsel.

20              THE COURT:  Please do, sir.

21              MR. BRUSTEIN:  First, I want to point out that

22   the timeframe that was put forth by defendants to search

23   for the videos was defendants' timeframe from 2 a.m. to

24   7 a.m.  That was not something that plaintiff was a part

25   of.  The second thing that I want --
```

```
  1                      PROCEEDING              24

  2          THE COURT:  One moment please, sir, if you were

  3    part of it, what would you have, would you have

  4    specified a different timeframe?

  5          MR. BRUSTEIN:  I don't know that I would've cut

  6    it off at 7 a.m., and the reason I say that is one of

  7    the videos that was produced by defendants was a video

  8    at the hospital at 5:21 a.m.  Our client was taken to

  9    the hospital.  He was sat on by, and when I say sat on,

 10    I mean that in the colloquial sense of a police officer

 11    watching at the bedside as opposed to physically sitting

 12    on, Your Honor.

 13          THE COURT:  Yes.

 14          MR. BRUSTEIN:  But he was under constant watch

 15    by the police because he was under arrest and not free

 16    to be left alone.  So the idea that there could be

 17    relevant videos beyond him being transported is possible

 18    for one.  The second thing is there's been no testimony

 19    or other evidence put forth about the accuracy of the

 20    timing on the body-worn camera footage.  So we do not

 21    know that all of the body-worn camera footage is linked

 22    up perfectly.

 23          The third thing I would point out is that our

 24    client was at a New Year's Eve party, so he didn't just

 25    show up at the event at, you know, 3 something in the
```

```
 1                      PROCEEDING              25
 2   morning which is when they are saying the timeframe
 3   should cut off.  He'd been there for a while.  It's
 4   possible that the video of these officers, they could've
 5   responded earlier in the night.  I don't know because we
 6   have not had an opportunity to see the memo books for
 7   each of these officers and to see anything about what
 8   entries were made in their memo books as to why they
 9   were recording things earlier in the night.
10          THE COURT:  Mr. Brustein, do you dispute that
11   the 911 call was placed at 3:36 in the morning?
12          MR. BRUSTEIN:  No, Your Honor, I'm saying I
13   don't know that the 911 call time matches up perfectly
14   with the body-worn camera clocks for the individual
15   systems.  So it may not match up perfect.  That's all
16   I'm suggesting.
17          THE COURT:  Okay, let me ask it slightly
18   differently, sir.  Do you believe that there were
19   officers on the scene before the 911 call was placed?
20          MR. BRUSTEIN:  That I don't believe, but I'm
21   not sure if an officer responded earlier.  I think that
22   it's, you know, a reasonable assumption that it's
23   probably about 3:30 when the 911 call was placed.  I
24   just don't want to suggest that the cutoff should be 2
25   o'clock.
```

```
 1                      PROCEEDING              26
 2          THE COURT:  Well, that's what's confusing to
 3   me.  I'm sorry, the defendants, thank you, the
 4   defendants began at 2 a.m. on the theory that that
 5   would've encompassed the 911 at 3:36  What is the time
 6   period that you, when do you believe this should've
 7   begun?
 8          MR. BRUSTEIN:  I guess I'm more referring to
 9   Officer Waite's body-worn cameras that start being
10   deleted at 3:33, Your Honor.  I'm not talking about the
11   body-worn camera at like 2:07.  I'm saying, you know,
12   whether it's off by a few minutes we don't know.
13          THE COURT:  I see, that – okay.
14          MR. BRUSTEIN:  Officer Waite has one, two,
15   three, four, five, six body-worn cameras that are
16   deleted between 3:33 and 5:25 in the morning.  And so
17   I'm suggesting that all of those may be relevant to
18   these proceedings.  I'm not suggesting that the full,
19   you know, 2 to 7 a.m. is the correct timeframe, but
20   rather we don't know that the body-worn cameras aren't
21   off by a few minutes and that some of those videos
22   didn't capture relevant information.
23          THE COURT:  Okay, could you please give me a
24   little bit more detail, Mr. Brustein, regarding your
25   argument about your client being at a New Year's Eve
```

1                    PROCEEDING          27

2 party and having been there for a while.  I'm not sure

3 how that plays into your concerns about the City's

4 definition of timeframes for the videos or the

5 production videos of something else or maybe it just is,

6 it adds to another argument that you're making.

7       MR. BRUSTEIN:  I'm happy to withdraw that

8 argument, Your Honor.

9       THE COURT:  All right, I won't think about that

10 then.  Tell me what I should be thinking about, sir.

11       MR. BRUSTEIN:  The other piece that I think is

12 significant is the claim that there was no obligation

13 for officers that were on scene to record.  The body-

14 worn camera system requires people to record when

15 they're responding to an ongoing event such as an

16 assault in progress which is what the 911 call was

17 about.  So any officer that stepped foot on that scene

18 should've been recording the moment they stepped foot on

19 that pavement.  And in terms of the building another

20 thing that I think is important for Your Honor to

21 understand, this is not a high-rise building.  This is

22 basically a storefront party room.  And so the front

23 door to this building is where the officers were

24 physically restraining our client.

25       THE COURT:  Tell me again please, sir, where

1                           PROCEEDING                    28

2  was the restraint taking place?

3          MR. BRUSTEIN:  So the last place that it was

4  taking place was at the front entrance to the building.

5  And so in the few clips that we have turned over or have

6  been turned over there are lots of officers congregating

7  within five or ten feet of where our client is laying on

8  the ground surrounded by officers on top of him.  I

9  would note that many of the officers that, you know,

10  defense counsel indicated were present and had body

11  cameras, he was unable to identify if they were inside

12  the building.  You know, it's unclear to me why, if we

13  knew 24 officers were on scene, the 24 officers weren't

14  each shown the few clips that we have and asked point

15  blank are you in this video, can you identify any of the

16  other officers that are in this video, were you inside,

17  did you touch the plaintiff, what happened.

18          You know, we are more than two years into this

19  litigation, and we are trying to get the breadcrumbs to

20  be able to put together what happened because the police

21  and the City did not preserve the evidence that they

22  had, and they did not record when they should've been

23  and were obligated to be recording.  The few body

24  cameras that we do have are short.  They are beginning

25  stepping out onto the sidewalk and waiting till either

```
 1                    PROCEEDING                    29
 2  the plaintiff is fully in the ambulance or till they
 3  left the scene.  Each one of them ends with the officer
 4  placing their hand on the camera and shutting it off.
 5          We submit that it's not a coincidence that the
 6  camera footage we have, first off, wasn't produced as
 7  part of the initial disclosures and it wasn't produced
 8  as part of the discovery responses and responses to our
 9  discovery demands specifically for this.  It wasn't
10  produced in response to the first motion to compel.  And
11  even the NYPD attorney in charge of the preservation
12  unit claimed in a sworn deposition, declaration that
13  there were no responsive videos even though her unit had
14  specifically turned them over to the Law Department more
15  than a year prior.
16          With respect to the videos here, it's not just
17  whether or not Detective Graney and Detective Nielsen
18  improperly categorized it.  It's whether the arresting
19  office, when he went in to the prosecutor's office, why
20  didn't he say, you know, ESU responded, they probably
21  had body cameras.  Let's try and find body cameras.
22  This is a criminal, this started out as a criminal case
23  and a criminal case went all the way up until trial
24  before it got dismissed.  It was pending more than a
25  year and a half.  Our client filed a notice of claims.
```

1                          PROCEEDING                    30

2   The City even took his deposition at a 50-H hearing.

3   None of those things triggered them to record these

4   videos.

5            And so we submit that, you know, the fact that

6   the videos that were turned over by NYPD to the Law

7   Department were somehow hidden from, you know,

8   plaintiff's counsel until, you know, we're basically on

9   a second motion to compel two years into this is all the

10  more reason that a negative inference here for the

11  missing and deleted body-worn camera footage is the just

12  and right outcome here.

13           THE COURT:  Okay.  Sir, what else would you

14  like me to know?

15           MR. BRUSTEIN:  With respect to the body-worn

16  camera footage or with respect to the other aspects of

17  the motion, Your Honor?

18           THE COURT:  I'll let you make your complete

19  motion now, thank you.

20           MR. BRUSTEIN:  Your Honor, with respect to the

21  other two aspects of the motion, we believe that we

22  should have an opportunity to depose Ms. Aronson.  She's

23  the attorney in charge of the NYPD body camera unit.

24  She submitted two declarations that were completely

25  contradictory in terms of the first one said there was

```
 1                         PROCEEDING            31
 2  no body-worn camera footage.  And the second one
 3  corrected it to say that there were, and many of them
 4  were deleted.  The fact that she's a fact witness what
 5  efforts were undertaken to preserve this?  Why, even
 6  though she got a notice from the Law Department prior to
 7  the videos being deleted, efforts weren't undertaken to
 8  preserve this evidence?  These are all things that are
 9  relevant.
10          Even if Your Honor grants our application for
11  the negative inference, that does not mean that a jury
12  needs to give it to award the inference.  It just means
13  they have the opportunity.  One of the things that we
14  would like to be able to present to the jury is all of
15  the opportunities that NYPD and the City of New York and
16  the individual officers had to preserve this video.  All
17  of the warning signs that should've triggered them to
18  protect this information so the jury could've decided
19  the case with all of the evidence and all of the things
20  that (indiscernible).  Because the City has put Ms.
21  Aronson forth as a fact witness by presenting the facts
22  of the preservation or lack of preservation, we believe
23  we should be entitled to question her about that, as
24  well as to their failure to preserve evidence.
25          With respect to our application for Your Honor
```

```
1                          PROCEEDING                    32
2    to voir dire Mr. Schemitsch and Ms. Scharfstein, the
3    reason we've framed it in that way is we have serious
4    questions about the way this case and this evidence was
5    handled, and we do not want to make it adversarial where
6    we are seeking to depose opposing counsel.  We
7    understand that that would certainly raise lots of
8    issues that we're not trying to get into.  However, we
9    do think there are serious questions about how the City
10   had five videos in their case file, and they were not
11   produced by the first attorney, and the second attorney
12   claimed not to know where they were and not to know that
13   they even existed until more than two years later.
14   These are very serious issues that have prejudiced our
15   client.
16          Sitting here today, we still don't know which
17   officers were actually inside of the venue.  We were
18   given this list of 24 officers who were in the vicinity
19   at or about the time of the incident.  And we were told
20   name them all if you want.  That's not an appropriate
21   way to prosecute a case.  And so we didn't.  We didn't
22   chose to name every single officer that was in the
23   vicinity at or about the time.  We tried to proceed with
24   this case in a judicious and fair way where we did not
25   name random officers just because they were in the
```

```
 1                    PROCEEDING              33
 2  vicinity at or about the time.  We asked that the City
 3  find out who the people were that were there so we could
 4  get to the bottom of what happened to our client and who
 5  should be held accountable for justice.
 6           Because of the delays of the defendants, the
 7  statute of limitations expired, and we still don't know
 8  who those John Doe officers are, and there should be
 9  consequences for the harm that it presents to our
10  client.  So we're asking for accountability and we're
11  asking for answers because we have been trying to get
12  that, and we still don't know who was present.
13           THE COURT:  The accountability that you seek,
14  sir, is in the form of the voir dire?
15           MR. BRUSTEIN:  Yes, Your Honor.
16           THE COURT:  And ultimately what is it you
17  think, I mean I've been questioning Mr. Schemitsch this
18  morning, afternoon, excuse me, sir, what is it you think
19  he's going to give you that he hasn't given to me?
20           MR. BRUSTEIN:  Your Honor, I don't know that
21  there's much more to questioning Mr. Schemitsch about,
22  and I think your questions have gotten very much to the
23  heart of them.  The one major question that I still have
24  with respect to Mr. Schemitsch is why he wasn't able to
25  find the videos in the case file and why those five
```

1                          PROCEEDING                    34

2    videos were not known by anyone except for Ms.

3    Scharfstein prior to when he turned them over to us.

4             THE COURT:  All right.  Mr. Schemitsch, I'll

5    hear you now.

6             MR. SCHEMITSCH:  Yes, Your Honor.  Touching on

7    a couple of points first with regard to the body-worn

8    camera videos.  With regard to the time stamps on them,

9    my understanding is that they are fairly accurate.  They

10   may be off by a couple of seconds, but they're certainly

11   not off by ten minutes.  Moreover, as to Officer Waite,

12   the earlier videos, there was a body-worn camera video

13   that was produced to plaintiff I believe at about 4:08

14   or 4:09 in the morning that depicts him driving to and

15   arriving on scene.  Any videos recorded before that

16   would simply just not have been arriving on scene.

17            As to the allegation of videos being recorded

18   at the hospital, generally I believe it is much more

19   discretionary for that, and officers are not required to

20   record at the hospital in part because of HIPAA

21   concerns.  So they typically do not, and the sole video

22   we have of the hospital that I'm aware of was handed

23   over, and it is very brief, just a few seconds.

24            Then, Your Honor, just touching on the heart of

25   the matter with the spoliation motion and a request for

```
 1                        PROCEEDING                35
 2   an adverse inference, the standards governed by Rule
 3   37(e) which is a three-part test, in relevant point the
 4   third part is whether the party responsible for the
 5   spoliation acted with the intent to deprive another
 6   party of the informations used in the litigation.  And
 7   simply put, there's no intent here.  Officers mis-
 8   tagging something does not go to intent to deprive
 9   information.  So plaintiff's request for an adverse
10   inference as far as that should be denied.
11           As to how the videos were finally found, Your
12   Honor, simply it was a mistake on my part.  I was not
13   aware of videos when I took over the case through a
14   misunderstanding by my part.  As soon as I became aware
15   of them, I handed them over immediately.  As far as Ms.
16   Aronson's search, my understanding is that they were,
17   they're categorized on our database system, it's called
18   evidence.com, the initial search for them put them into
19   one folder, and my understanding was when I came onto
20   the case and had them perform searches under different
21   parameters, they only found the one video of the
22   hospital, and that was put into a separate folder.  So
23   it was my understanding from only being aware of the
24   second folder that the first folder did not exist.  Once
25   I was made aware of it, I handed them over to counsel
```

1                              PROCEEDING                    36

2    the next day, and that was I believe sometime in

3    November.  And to be clear, those videos that are held

4    in a separate system.

5           As far as Ms. Aronson it's my understanding

6    that the initial declaration she did was, again, based

7    off of looking into a separate folder.  The need for the

8    supplemental declaration was both as Your Honor ordered

9    in response to specific questions that Your Honor

10   directed Ms. Aronson to respond to.  The timeframe was

11   one that my office suggested for searching from 2 a.m.

12   to 7 a.m. in orderly to be overly inclusive and to show

13   that we all are not hiding any videos.  There are no

14   additional videos of this incident.  And I don't

15   understand counsel's argument that there's more than

16   three possible videos just by timeframe, as I've laid

17   out today and as I've laid out in our response.

18          THE COURT:  Mr. Schemitsch, excuse me, I

19   believe one of the points is that in the videos that

20   they are looking at, they're seeing officers

21   congregating near an arrest being effectuated.  They are

22   expecting that those officers would themselves have

23   body-worn cameras turned on to observe the arrest.  Now,

24   perhaps what you're going to tell me is that there's a

25   difference between observing an arrest and participating

2   in it, and you only have to have the camera on if you're

3   actually involved in the arrest and not if you're five

4   feet away watching it take place.  But I think that's

5   part of Mr. Brustein's concern.  He's seeing a gaggle of

6   officers and wants to know why they themselves do not

7   have their cameras on.

8              MR. SCHEMITSCH:  And I understand that concern,

9   Your Honor, but that does not simply go to a spoliation

10  motion.  There's nothing being destroyed at that point.

11  It simply was never created at that point.  And we have

12  attempted to try to identify those officers, and from

13  the individuals that I have been aware of who have been

14  part of that specific group, they've not been able to

15  identify anymore than I've identified to counsel.

16             Plaintiff seems to be making this case out to

17  be some sort of conspiracy to keep videos that we have

18  from plaintiff, including these officers, Ms. Aronson,

19  corporation counsel, and myself.  That simply is not the

20  case, Your Honor.  We've been handing over these

21  documents as we've gotten them and as I've been made

22  aware of them.  And I apologize for not being made aware

23  of them sooner, but I handed them over as soon as I was

24  aware of them.

25             My understanding from Ms. Aronson's declaration

1                         PROCEEDING                    38

2   was that the supplemental one was responding to Your

3   Honor's specific questions and also detailing the full

4   spectrum of possible videos that could be available.  We

5   were not listing 16 videos that were deleted that we're

6   aware of that were deleted nor is she declaring that in

7   any way.

8           THE COURT:  But, sir, do you agree with

9   plaintiff's counsel that Ms. Aronson's supplemental

10  declaration is at odds at least in part with her initial

11  declaration?

12          MR. SCHEMITSCH:  Only insofar as her first

13  search was of what did not find anything in that she was

14  searching that first other separate folder.  That's my

15  understanding, Your Honor.

16          THE COURT:  Okay.  All right, please continue,

17  sir.

18          MR. SCHEMITSCH:  As far as the declaration or

19  the proposed voir dire and myself and prior counsel,

20  there's simply not basis for that, Your Honor.  I'm

21  being as forthcoming as I can to the Court while also

22  maintaining any privilege and work product.  This is a

23  case about a discrete incident that shouldn't require

24  the kind of litigation that's happening here, and

25  seeking to bring in defendants' attorneys in for

1                              PROCEEDING                    39

2    questioning, it's emblematic of how this case has

3    proceeded as opposed to focusing on the merits of the

4    case at issue

5              THE COURT:  Sir, I have to disagree with you at

6    least in part.  I feel as though getting information

7    from you and your colleague has been like pulling teeth,

8    and it's not, it's bad enough that I'm getting the wrong

9    information but plaintiff's counsel is as well, and it's

10   making litigation decisions based on it.  So I

11   appreciate that – there are times in which I can

12   understand that an effort to voir dire opposing counsel

13   could be seen as vexatious.  I'm not entirely sure it is

14   here given the manner in which evidence has been

15   disclosed to plaintiff's counsel in this case, but I

16   understand you hold a different view than I do.

17             Just before you go declaiming it as some sort

18   of grandstanding or just a litigation tactic, understand

19   that there's more to it in this case than there are in

20   many cases that I have.  Could you, sir, just please go

21   back to an issue that you and I were talking about

22   earlier in this conference, and that is is it, in fact,

23   the fact the case that you told plaintiff's counsel that

24   they could just name all 24 officers as defendants and

25   just sort of figure it out, and Isuppose the idea would

1                                PROCEEDING                40

2    be that later on they could figure out who was actually

3    involved?  Was that --

4              (interposing)

5              MR. SCHEMITSCH:  I did not --

6              THE COURT:  Okay, you did not.

7              MR. SCHEMITSCH:  I did not suggest that, Your

8    Honor.

9              THE COURT:  Okay, but am I - I'm correct, am I

10   not, that even today, as you and I and Mr. Brustein and

11   Mr. Bromberg are having this conversation, we still

12   don't know definitively who was there, who was there and

13   walked inside, and what role each of the officers listed

14   in that table actually played in the events underlying

15   this case, correct?

16             MR. SCHEMITSCH:  That's correct, Your Honor,

17   this was a chaotic scene, it was very dark, and with the

18   information that we have available to us that I've gone

19   through and I've gone through with multiple people going

20   through these videos have not been able to get beyond

21   what I've produced to counsel for what the officers

22   remember of who was on scene and who participate in

23   what.

24             THE COURT:  Okay, but you've talked to half of

25   the officers.  What is keeping you from speaking to the

```
 1                        PROCEEDING              41
 2   other half or is it your - let me just ask this
 3   question, is it your expectation that Mr. Brustein can
 4   simply ask to depose every single one of the 24 and
 5   you'll produce all 24 of them?
 6           MR. SCHEMITSCH:  Your Honor, I'm happy to talk
 7   to the rest of them.  I don't expect any of the rest of
 8   them to have any more information than the officers that
 9   were directly involved who do have a recollection of the
10   scene.
11           THE COURT:  You haven't quite answered my
12   question, sir.  You're going to oppose it if they ask to
13   depose all 24?  Excuse me, Mr. Schemitsch, that was
14   directed at you.
15           MR. SCHEMITSCH:  Yes, Your Honor, one moment.
16           (pause in proceeding)
17           MR. SCHEMITSCH:  Your Honor, I think it would
18   make sense to first start with any of the individuals
19   who do recall things and then should more become
20   necessary, no, I would not oppose more should they
21   become necessary.
22           THE COURT:  But if you haven't spoken with
23   them, how is it that Mr. Brustein can have confidence
24   that they don't know?
25           MR. SCHEMITSCH:  I think, Your Honor, based on
```

```
 1                         PROCEEDING                42
 2   the limited memory of those who were directly involved
 3   on the scene, that's the expectation that would
 4   continue.
 5           THE COURT:  Counsel, I'm just going to dim my
 6   camera and I'm going to turn off the mic for a few
 7   moments.  I just want to think about the notes I've just
 8   taken.  I'll come back to you as soon as I can.  Let's
 9   imagine that that'll take about five minutes.  So if you
10   need to stretch your legs and walk around, please do so,
11   and I'll come back as soon as I can.  Thank you very
12   much.
13           (pause in proceeding)
14           THE COURT:  Counsel, I appreciate very much
15   your patience, and let me please confirm that you're
16   able to see and hear me once again.
17           MR. BROMBERG:  Yes.
18           MR. SCHEMITSCH:  Yes.
19           MR. BRUSTEIN:  Yes.
20           THE COURT:  Thank you so much.  All right, each
21   of you has now changed orientation on my platform, so I
22   suppose that's fun too.  Thank you.  Again, I do thank
23   you for your patience.  You've given me a lot to think
24   about, and I'm going to take these out of order.
25           I'm not going to order the voir dire of the two
```

```
 1                      PROCEEDING            43
 2   Law Department attorneys, although I understand and
 3   actually in this conversation have shared some of the
 4   frustration that plaintiff's counsel has experienced.  I
 5   do think that the questions that I asked of Mr.
 6   Schemitsch has given me and hopefully has given
 7   plaintiff's counsel better sense of what has happened.
 8   And so I don't think it is necessary to have a further
 9   voir dire on them.
10          On the issue of the deposition of Ms. Aronson,
11   I'm not going to order that either because I accept that
12   the supplemental declaration is a clarification and an
13   explanation of what happened and how it differed from
14   the initial declaration.  That said, if evidence coms up
15   later in this case that suggests that that declaration
16   is itself incorrect, then I suppose all bets are off,
17   and we'll revisit this.
18          The issue on which I focused the most is the
19   spoliation motion and a request for an adverse
20   inference, and, again, I completely understand why
21   plaintiff's counsel is asking for this, and I think it
22   is somewhat disturbing, I'll use that term, that they
23   haven't years into this, three years into this
24   litigation been given the clarity they need who was
25   involved.  That said, having spoken with defense counsel
```

1  PROCEEDING                    44

2  today and having reviewed the submissions, I don't think

3  the requisite intent is here to warrant an adverse

4  inference.  So what I'm going to do is something else.

5        Mr. Schemitsch, I am giving you one month until

6  April 14 in order to speak or to speak again with every

7  person on that chart, all 24 officers.  By now you have

8  to know what I'm interested in which is what they were

9  doing that night, where they were, what involvement they

10  had, whether they had body-worn cameras and turned them

11  on if they can recall.  But we need to, you need to at

12  least give some measure of information to plaintiff's

13  counsel so they can make appropriate use of their

14  discovery time with respect to depositions.

15        So, sir, on or before the 14th of April you are

16  going to advise plaintiff's counsel of the non-

17  privileged results of your communications with each of

18  these officers.  You must convey to plaintiff's counsel

19  the information you've received from the officers about

20  their understanding of when they arrived, where they

21  arrived, and what they did with respect to the events at

22  issue in this litigation.  Again, I'm not asking you to

23  turn over privileged information; I am asking you to

24  turn over enough information so that Mr. Brustein and

25  Mr. Bromberg can figure out who they need to depose.

```
1                    PROCEEDING              45
2              What I'm then going to ask from Mr. Brustein is
3    may I please by the 28th of April have a schedule, a
4    proposed schedule that encompasses what depositions the
5    parties believe need to take place.  I'm not sure the
6    defense needs to depose anybody else, but you'll tell
7    me.  And what is a reasonable schedule on which those
8    depositions can proceed.
9              Mr. Brustein, you may well be within your
10   rights, sir, to depose all 24 of them.  I'm not sure you
11   want to do that.  I'm not sure you'd find that useful.
12   But I would at least be open to it if you felt you
13   needed to as a result of the information you receive
14   from Mr. Schemitsch.  For now, sir, I think it's better
15   that you receive from him the information that he
16   obtains from the interviews he should've had or his
17   colleagues should've had years earlier, and you can then
18   make a decision about whom you wish to depose.
19             Mr. Schemitsch, are there defense depositions
20   that have not taken place yet?
21             MR. SCHEMITSCH:  There's the continuation of
22   plaintiff's deposition which for similar reasons, as
23   counsel said with Officer Waite, we've been unable to
24   lock down a date just on availability of counsel and the
25   parties.
```

```
 1                      PROCEEDING                 46

 2              THE COURT:  Okay, well, I'm sure that will be

 3   scheduled as well.  Sir, you were about to say something

 4   else, excuse me.

 5              MR. SCHEMITSCH:  I was just going to continue,

 6   but, yes, Your Honor, that's it.

 7              THE COURT:  Okay.  All right, Mr. Schemitsch,

 8   is there anything confusing about the directive I've

 9   just given you?

10              MR. SCHEMITSCH:  No, there's not, Your Honor.

11              THE COURT:  All right, and I'm not trying to

12   pour salt in your open wounds, sir, but to the extent

13   that things are not happening because you need a written

14   order from me, then tell me what language you need to

15   get people to call you back and to give you information?

16   I'm going to tell myself you don't need anything further

17   and it's enough to give you this oral directive, which

18   is an order, but if you need more, let me know, and I'll

19   get something that will compel people to talk to you.

20   Do you understand, sir?

21              MR. SCHEMITSCH:  Yes, I understand, Your Honor.

22              THE COURT:  All right, thank you very much.

23   Mr. Brustein, is there anything unclear about what I've

24   just said, sir?

25              MR. BRUSTEIN:  Unclear no, but there's two
```

1                          PROCEEDING                    47

2   things, one that I'd like to just clarify from earlier

3   and one that I'd like to respond if possible, Your

4   Honor.

5            THE COURT:  Go ahead please, sir?

6            MR. BRUSTEIN:  The first is just to confirm the

7   attorney that had made the comment about the 24 names

8   was not Mr. Schemitsch.  It was prior counsel --

9            (interposing)

10           THE COURT:  That's fine.

11           MR. BRUSTEIN:  I'm sorry?

12           THE COURT:  I appreciate know that, sir, that's

13  okay, thank you.  To be clear, I intuited as much from

14  Mr. Schemitsch when he told me it wasn't he, but thank

15  you.  Okay, go ahead.

16           MR. BRUSTEIN:  I wanted to avoid naming people,

17  you know, but I also didn't want Mr. Schemitsch be

18  unnecessarily blemished.

19           The second thing is with respect to the showing

20  of state of mind.  I just wanted to gently push back,

21  Your Honor, that in this circuit ordinary negligence is

22  sufficient, and, you know, that's coming from *Phoenix 4*

23  *Inc. v. Strategic Res Corp.*, which is a 2006 W.L.

24  1409413 is the citation.  It's in the Southern District

25  of New York, and it's a 2006 decision that says, "The

```
 1                        PROCEEDING               48
 2   culpable state of mind requirement is satisfied in this
 3   circuit by a showing of ordinary negligence," and we
 4   would submit that clearly the fact that a criminal case
 5   was pending and even just the three videos that were
 6   conceded were deleted would be negligent based on
 7   criminal obligations as well as the civil obligations.
 8   And so we would submit that we have met that burden.
 9            THE COURT:  I appreciate the effort, and I
10   respect very much the argument that you're making.  I do
11   disagree with it.  I don't think the requisite intent
12   was shown here, and I do think the penalty would be too
13   severe given what I understand to be the number of
14   videos.  But I appreciate you've made your record, sir.
15            Let me just note, because I will otherwise
16   forget this, we currently have an April 6 conference.
17   I'm adjourning that conference sine die because I want
18   the parties to have the opportunity to get the
19   information they need so that depositions can be
20   meaningful.  So I'm sure one of you is going to tell me
21   what about this conference; I'm now telling you what
22   about the conference.
23            Mr. Brustein, let me also just say that I was
24   worried, sir, when I began this conference that my
25   written endorsements weren't communicating my concerns
```

```
 1                         PROCEEDING                    49
 2  sufficiently, and I still hold that worry.  So my hope
 3  is that today I've communicated to the parties my
 4  concerns about the progress of this litigation and about
 5  the defendants', that counsel's responses to it.  For
 6  now, sir, I've given you the decision I've given you.
 7  If the record changes in the future and it's appropriate
 8  to either raise the issue again or to raise it in the
 9  context of in limine practice before trial, then perhaps
10  I'll hear from you again on this point.
11            For now what I hope the parties understand from
12  this is that I care, I care about this case, I care
13  about it proceeding justly.  I care about, even
14  recognizing that everyone's busy, so am I, I want you to
15  take care of this case and to make sure it has the
16  attention that it needs.
17            With that, I now have my dates, I have April 14
18  for Mr. Schemitsch, and I'm pointing at an empty screen
19  which isn't so helpful, and April 28, Mr. Brustein, I'll
20  ask you for that letter with the schedule, and I thank
21  you in advance for sending it.  Counsel, with that, I'm
22  going to let you go because I know you have other
23  important things to do.  Thank you so very much for your
24  time today.  Please stay well in this pandemic.  We're
25  adjourned, thank you.
```

```
 1                          PROCEEDING                    50
 2          MR. BRUSTEIN:   Thank you, Your Honor.
 3          MR. BROMBERG:   Thank you.
 4          MR. SCHEMITSCH:   Thank you, Your Honor.
 5          (Whereupon, the matter is adjourned.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

51

<u>C E R T I F I C A T E</u>

  I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of DOMINGUEZ v. CITY OF NEW YORK, et al., Docket #21cv2302, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

    Carole Ludwig

Date:  July 24, 2025